IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **DORIS THRUSH**, Individually, and as Administrator of the Estate of Charlie Thrush, Deceased, and as Next Friend and Natural Mother of minors, H.T. and A.T.<br><br>Plaintiff<br><br>v.<br><br>**CNH INDUSTRIAL AMERICA, LLC**<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No.<br>)<br>)<br>) JURY TRIAL DEMANDED<br>) |

## COMPLAINT

Plaintiff Doris Thrush, by and through her counsel of record, for her demand for damages against Defendant CNH Industrial America, LLC, states as follows:

**Parties, Jurisdiction, and Venue**

1. Plaintiff Doris Thrush is a resident of the State of Kansas and is the lawful spouse of Charlie Thrush, deceased, who was killed while operating the Case Skid Steer Loader in the incident that forms the basis of this lawsuit. As pled herein, Plaintiff Doris Thrush has suffered losses and damages as a result of her husband's death. As such, Plaintiff is an "heir-at-law" who is entitled to commence this action pursuant to K.S.A. § 60-1902.

2. Plaintiff is also the duly appointed Administrator for the Estate of Charlie Thrush and is therefore the proper party to bring the survival claims pursuant to K.S.A. § 60-1801 *et seq.*

3. Plaintiff also brings claims as the Natural Mother and Next Friend, on behalf of her minor children, H.T. and A.T., for their claims for the death of their natural father, Charlie Thrush as they are also "heirs at law" entitled to join this action pursuant to K.S.A. § 60-1902.

4. Defendant CNH Industrial America, LLC ("CNH"), is a limited liability company organized and existing under the laws of the State of Delaware, with its headquarters in the State of Wisconsin. Defendant CNH is registered to do business in the State of Kansas, where it operates manufacturing facilities in Sedgwick County, Kansas, and maintains a registered agent for service of process in the State of Kansas.

5. Defendant CNH designed, manufactured, marketed, promoted, and sold the Case Model 1840 Uni-Loader ("Skid Steer") that is the subject of this lawsuit.

6. Defendant CNH was present and transacted, solicited, and conducted business in Kansas, through its employees, agents and/or sales representatives and derived revenue from business in the State of Kansas.

7. At all times relevant to the claims herein, Defendant CNH placed the defective Skid Steer into the stream of interstate commerce knowing and expecting that it would end up in the State of Kansas and cause injury in Kansas to residents of the State of Kansas. Defendant CNH purposefully directed marketing and sales efforts toward the State of Kansas and had the intent to sell products, including the subject Skid Steer, in the State of Kansas.

8. On information and belief, CNH also either owned and/or leased real estate in the State of Kansas for its manufacturing plant in Wichita, Kansas and entered into other contracts in the State of Kansas in connection with its manufacturing operations in Wichita – which is also where the subject Skid Steer was manufactured, assembled, and from which it entered the stream of commerce.

9. Accordingly, Defendant CNH is conclusively presumed to have been doing business in this state and subject to Kansas long arm jurisdiction.

10. Defendant CNH also has continuous, systematic, and substantial contacts with the State of Kansas by virtue of maintaining a major manufacturing facility in Sedgwick County, Kansas at 3301 S. Hoover Road in Wichita, Kansas – where it manufactures some of the products it sells, including skid steer loaders like the subject Skid Steer.

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) as the case is between a citizen of a U.S. State and a citizen or subject of a foreign state, and the amount in controversy exceeds the sum or value of $75,000.00 exclusive of interest and costs.

12. This action arises out of an incident that occurred near Ellsworth, Kansas in Lincoln County.  Therefore, Venue is proper in this Court pursuant to 28 U.S.C. §§ 96 and 1391.

**Facts Common to All Counts**

13. In October of 2020 Charlie Thrush was living and working in Ellsworth, Kansas with his wife and two young daughters.

14. On October 4th, 2020 Charlie Thrush was operating the subject Skid Steer Loader on his father-in-law's farm, to help out his father-in-law by moving round hay bales from the field to a barn, for feeding horses. Mr. Thrush suffered fatal injuries when the skid steer tipped over onto its top and then became engulfed in flames. On information and belief, Mr. Thrush was burned alive when he could not escape the burning skid steer due to the position of the lift arms and hay bale that he had been carrying on the front of the machine. On information and belief, Mr. Thrush experienced severe conscious pain, suffering, fright, and terror during the time between the start of the fire and continuing until his death.

15. Based on facts discovered to date, the source of the fire appears to have been hydraulic fluid that leaked from a vented hydraulic fluid filler cap while the Skid Steer was upside down.  The leaking fluid dripping onto and ran along what is normally the upper lip of the engine

3

bay door, but that was now at the bottom of the upside down engine bay, to the area near the hot exhaust parts, where vapors from the hydraulic fluid were ignited.

16.     The subject skid steer loader was designed, manufactured, tested, sold, distributed, and marketed by Defendant CNH.

17.     A picture of a similar Case New Holland Model 1845C Skid Steer Loader, taken from one of Defendant CNH's product brochures for Model 1840 and 1845 Uni-Loaders, is below.



18.     Mr. Thrush was hauling round bales of hay similar to what is depicted below, also taken from one of Defendant CNH's product brochures.

4



19. The subject Skid Steer – just like all other similar pieces of equipment – was equipped with a rollover protection structure ("ROPS"), to provide protection for the operator in the event of a tip-over – something that is a well-known foreseeable, and even likely, occurrence during foreseeable and reasonably anticipated uses of the machine. The object of the ROPS design is that, given the relatively common occurrence of tip-overs, an operator should be able to experience such an event without being crushed and able to walk away, without serious injury.

20. For machines like the subject Skid Steer equipped with ROPS, the industry has recognized that to keep the operator reasonably safe in a tip-over – just as important as making sure the operator is not crushed – the machine should be designed so that the operator is not injured by leaking of hot, flammable, or otherwise hazardous fluids from the engine, battery, or hydraulic systems. The recognition of this important design consideration is so well understood within the

industry that it was adopted and included with standards that have been published by the Society of Automotive Engineers ("SAE").

21.     SAE Standard "Operator Protection for General-Purpose Industrial Machines, SAE J1042, provides as follows:

> 3. **Rollover Protection**—In order to fulfill the intended purpose of this document, subject machines shall be equipped as specified in 3.1 and 3.2.
>     3.1 A rollover protective structure (ROPS) per SAE J1040. Wheeled machines similar in configuration to agricultural tractors may, as an alternative, be equipped with a ROPS per SAE J1194.
>     3.2 Seat belts conforming to SAE J386. The seat mounting and seat belt anchorage(s) shall meet the requirements of SAE J386.
>     3.3 To reduce further the probability or severity of operator injury in the event of a rollover, attention to the following details is recommended:
>     3.3.1 Batteries, fuel tanks, oil reservoirs, and coolant systems should be constructed, located, or sealed to minimize likelihood of spillage on the operator.
>     3.3.2 Edges, corners, or other sharp projections that might be struck by the head or torso of an operator restrained by a seat belt per 3.2 should be avoided, suitably padded, or designed to break away on impact.

22.     The SAE recommended practice applying specifically to "Personnel Protection—Skid Steer Loaders," SAE J1388, indicates Skid Steers should also comply with J1042:

> 6. **Operator Guards and Shields**
>     6.1 The following shall be shielded or guarded by location.
>     6.1.1 Nip point of exposed gear, belt, and chain drives.
>     6.1.2 Outside faces of pulleys, sheaves, sprockets, cooling fans, and gears that rotate when the engine is running with all clutches disengaged.
>     6.1.3 Rotating parts with projections such as exposed bolts, keys, or set screws.
>     6.1.4 Revolving shafts, except smooth shaft ends, protruding less than one-half the outside diameter of the shaft.
>     **6.2 Fluid System Guarding**
>     6.2.1 Batteries, fuel tanks, oil reservoirs, and coolant system should be constructed, located, or sealed per guidelines in SAE J1042 (April, 1980).
>     6.3 Guard Design
>     6.3.1 The guard and its support shall be capable of withstanding the weight of a 120 kg (265 lb) person.
>     6.3.2 Guards which must be opened for frequent lubrication or inspection, such as required for field maintenance, shall be hinged or otherwise permanently attached and latched.

23. The above standards pre-date the design and manufacture of the subject Skid Steer by a decade or more.

24. Due to the foreseeability of tip-overs and the above-described standards, manufacturers and sellers of other skid steers and agricultural equipment have utilized designs for their hydraulic fluid filler caps that, while allowing venting to the atmosphere to prevent the creation of a vacuum inside the hydraulic system, remain "fluid-tight" when the vehicle is inverted due to a tip-over event.

25. Accordingly, such alternative safer designs are both feasible and available to Defendant CNH.

26. The vented hydraulic fluid filler cap on the subject Skid Steer can be seen in a photo taken from the Operator's Manual for 1840-series models, which includes the subject Skid Steer:



1. FILLER CAP

27. The hydraulic filler cap is inside the engine bay, as can be seen in the post-fire photo of the subject Skid Steer below.



28. The vented hydraulic filler cap uses a three-part design with a black "outer-cover" being the primary visible component – as seen in the black and white image from the operator's manual above – which is the part that a user's hand grips when screwing it in or out. Inside is a paper element air filter that is intended to prevent dust contamination from getting into the hydraulic fluid through the vented cap. Lastly, there is a base to the cap which is what contains the threads and screws into the frame mounted opening for the hydraulic fluid reservoir.

29. It should be noted in the post-fire photo that the black outer cover is not present. On information and belief, the outer cover – which utilizes a press-fit to attach to the base of the cap – came off during the fire when it expanded from the heat more quickly than the base of the

8

cap and dropped off when the machine was upside down. As would be expected, the internal paper air filter element would have simply been consumed by the fire.

30. Plaintiff has suffered a variety of damages and losses as a direct and proximate result of the death of her husband, Charlie Thrush, including but not limited to the loss of counsel, aid, assistance, comfort, society, and consortium. All of these harms and losses have been suffered both in the past and will continue to be suffered in the future.

31. Additionally, Charlie Thrush experienced severe conscious pain, suffering, fright, and terror during the time between the start of the fire and continuing until his death, for such survival damages Plaintiff is seeking recovery as the administrator of Mr. Thrush's estate.

32. In the ordinary course of its business, Defendant CNH designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the subject Model 1840 Skid Steer Loader described more fully above.

33. Defendant CNH's products, including the subject Skid Steer, can be utilized safely for more than ten (10) years. Further, Skid Steers and other similar products have a useful safe life of multiple decades and are commonly and routinely used for such periods of time by end users, all of which was known, foreseeable, and specifically intended by, Defendant CNH.

34. Defendant CNH still provides support for its machines long past the first 10 years that they are in service, via the sale of parts and the provision of service through its dealership network. Defendant CNH's support for its machines over multiple decades indicate that it knows and recognizes its machines have a useful safe life of much more than ten (10) years.

**COUNT I: "Product Liability Claim" – Sounding in Strict Products Liability
Pursuant to the Kansas Product Liability Act, K.S.A. § 60-3301, *et seq*.**

35. Plaintiff incorporates herein by reference as if fully set forth herein, each and every allegation set forth above.

36. The injuries to, and death of, Charlie Thrush resulted from conditions of the subject Skid Steer.

37. The conditions of the Skid Steer that were a cause of the injuries to and death of Charlie Thrush were unreasonably dangerous.

38. The conditions of the Skid Steer that are complained of herein, existed at the time it left Defendant CNH's control.

39. At all relevant times, the subject Skid Steer was in a defective and unreasonably dangerous condition by reason of its design, thereby exposing foreseeable users to unreasonable risk of harm, such as Plaintiff.

40. The Skid Steer was further defective and unreasonably dangerous by reason of its lack of adequately designed warnings and instructions provided with the product at the time of sale and distribution.

41. The Skid Steer was in an unsafe, defective, and unreasonably dangerous condition at the time it left Defendants' control.  The defective conditions which were responsible for Mr. Thrush's injuries and wrongful death were in substantially the same condition at the time of the incidents described herein, that they were in when the product left Defendant CNH's control.

42. The Skid Steer was expected to and did reach the usual consumers, handlers and persons coming into contact with the product – including Plaintiff – without substantial change in the condition in which it was designed, produced, manufactured, sold, distributed and marketed by Defendant CNH.

43. The Skid Steer's unsafe, defective, and inherently dangerous condition was a direct and proximate cause of injury to Plaintiff.

44. The design of the Skid Steer rendered it dangerous to an extent beyond that which would be contemplated by an ordinary consumer with ordinary knowledge common to the community as to its characteristics, even when used in a manner that was foreseeable to or reasonably anticipated by Defendant CNH.

45. Mr. Charlie Thrush's injuries and wrongful death, and Plaintiff's damages and losses suffered thereby, resulted from use of Skid Steer that was intended by and/or reasonably foreseeable to Defendant CNH.

46. At all relevant times, the Skid Steer posed a foreseeable risk of danger inherent in the design which greatly outweighed the benefits of that design.

47. The Skid Steer lacked sufficient utility for any group of consumers, including Plaintiff.

48. The Skid Steer's design is defective and unreasonably dangerous due to *inter alia*:

   a. The vented hydraulic filler cap for hydraulic fluid fails to retain the flammable fluid in the event of a foreseeable rollover event when the machine can be turned upside down;

   b. The product lacks sufficient warnings and instructions and is thereby defective and unreasonably dangerous;

   c. The product lacks sufficient guards or protective features to prevent injuries like those suffered by Plaintiff;

   d. The Skid Steer is defective and unreasonably dangerous due to the lack of adequate testing for safe performance during a tip-over event;

49. As designed, manufactured, warned, sold and supplied by Defendant, the Skid Steer is defective and unreasonably dangerous and was so when it was placed into the stream of commerce by Defendant; and

50. Feasible alternative designs and warnings existed that would have prevented Plaintiff's injuries and wrongful death.

51. As a direct and proximate result of Defendant's design for the vented hydraulic fluid filler cap, Plaintiff experienced and/or will experience severe harmful effects including those identified above.

WHEREFORE, Plaintiff prays for Judgment against Defendant on Count I of her Complaint, for a fair and reasonable sum of damages in excess of $75,000, for interest on any judgment entered, for her costs herein, and for such other and further relief as the Court deems just and proper.

### COUNT II: "Product Liability Claim" – Sounding in Negligence
### Pursuant to the Kansas Product Liability Act, K.S.A. § 60-3301, *et seq.*

52. Plaintiff incorporates herein by reference as if fully set forth herein, each and every allegation set forth above.

53. The Defendant developed, designed, tested, assembled, manufactured, labeled, distributed, marketed, advertised and sold the Skid Steer in the ordinary course of its business.

54. Defendant, as a designer, manufacturer, marketer, distributor and seller of the Skid Steer had a duty to use that degree of reasonable care that would be exercised by an expert product manufacturer in the design, manufacture, testing, assembly, labeling, distribution, marketing, sale and post-sale conduct relating to such products, including the subject Skid Steer.

55. At the time Defendant sold the subject Skid Steer, it was in a defective and unreasonably dangerous condition by reason of its design, thereby exposing foreseeable users to

unreasonable risk of harm, such as Plaintiff.  The Skid Steer was further defective and unreasonably dangerous by reason of its lack of adequately designed warnings and instructions provided with the product at the time of sale and distribution.

56. Defendant CNH had a duty to use that degree of skill, care, caution, and expertise as that of a reasonably prudent and careful expert product manufacturer to design, manufacture, market, and sell a product that was not unreasonably dangerous for its normal, intended use.

57. The Skid Steer was defective and unreasonably dangerous and Defendant CNH knew or had reason to know that it was defective and unreasonably dangerous when used in the form and manner as provided by Defendants.

58. Defendant CNH knew or should have known that its Skid Steer was in a defective condition and was and was unreasonably dangerous.

59. Defendant CNH failed to complete adequate pre-market testing and post-market surveillance on the subject Skid Steer.

60. Defendant failed to use the degree of care, skill and learning that would be used by an ordinarily careful expert in Defendants' business in its design, manufacture, testing, assembly, labeling, distribution, marketing, sale, and post-sale of the subject Skid Steer in a number of respects including, but not limited to, the following acts and omissions:

    a. Negligently designing, manufacturing, labeling, and selling the subject Skid Steer in a defective condition that was unreasonably dangerous when put to reasonably anticipated uses when Defendant knew or by exercising due care could have discovered the subject product's dangerous condition;

    b. Negligently designing the Skid Steer in ways that rendered it defective and unreasonably dangerous in numerous respects, including but not limited to:

      failing to comply with industry standards for use of a hydraulic fluid filler cap that could remain fluid-tight in the foreseeable event of a tip-over incident;

c. Negligently, carelessly, or recklessly failing to adequately test and investigate the defective and unreasonably dangerous condition of its subject product;

d. Failing to adequately test the subject Skid Steer's performance in foreseeable tip-over events to ensure it did not create an unreasonable risk of harm to users like Charlie Thrush in a number of respects, including making sure it complied with the requirements of SAE standards J1042 and J1388;

e. Failing to utilize one of the available and feasible alternative designs on the market for hydraulic fluid filler caps that allow for venting while remaining fluid-tight during a foreseeable tip-over event and / or failing to design its own hydraulic fluid filler cap such that it would perform similarly to those safer alternative designs already on the market;

f. Selling the subject product in a defective condition without giving reasonable warning of latent dangers in the reasonably foreseeable uses thereof – dangers Defendants knew or in the exercise of reasonable care could have known;

g. Failing to provide adequate warnings or disclosure of the dangerous defects in the subject Skid Steer to Plaintiff after the time of its original sale but before Plaintiff's injuries in October of 2020, and

h. Failing to discharge its duties to recall and retrofit under applicable law.

61.    As a direct and proximate result of Defendant's acts and omissions and those of its principals, agents, workers, servants, and/or employees, Charlie Thrush was killed and Plaintiff suffered the resulting damages and losses as pled herein.

14

WHEREFORE, Plaintiff prays for Judgment against Defendant on Count II of her Complaint, for a fair and reasonable sum of damages in excess of $75,000, for interest on any judgment entered, for her costs herein, and for such other and further relief as the Court deems just and proper.

**COUNT III: Breach of Warranty Claim
Pursuant to the Kansas Consumer Protection Act, K.S.A. § 50-623, *et. seq*.**

62. Plaintiff incorporates herein by reference as if fully set forth herein, each and every allegation set forth above.

63. Mr. Lloyd Kottman, the registered owner of the subject Skid Steer, and Charlie Thrush were both "consumers" as defined in the Kansas Consumer Protection Act, K.S.A. § 50-624(c).

64. Defendant CNH is a "supplier" as defined in the Kansas Consumer Protection Act, K.S.A. § 50-624(j).

65. The sale of the subject Skid Steer by Defendant CNH was a "consumer transaction" as defined by the Kansas Consumer Protection Act, K.S.A. § 50-624(j).

66. The condition of the subject Skid Steer constituted various breaches of warranties under the Kansas Consumer Protection Act, and those breaches were a cause of the wrongful death of Charlie Thrush and the resulting damages to Plaintiff as pled herein. Those warranty breaches include both express and implied warranties as defined within the Kansas Consumer Protection Act for the reasons that have been pled more fully herein as constituting the product's defective and unreasonably dangerous design and Defendant CNH's negligence in the design, testing, marketing and sale of the subject Skid Steer loader, which are incorporated herein by reference.

67. The sale of the subject Skid Steer by Defendant CNH was a deceptive act as defined in the Kansas Consumer Protection Act, K.S.A. § 50-626(b), in various respects, including but not

15

limited to the fact Defendant represented that the subject Skid Steer was of a particular standard, grade, quality, style or model when in fact its condition departed materially from the representations. Defendant CNH represented that the subject Skid Steer was fit for its particular purpose when in fact it was not given its defective and unreasonably dangerous design that allowed for the spilling of hot and flammable hydraulic fluid in the event of a foreseeable tip-over. In other words Defendant CNH represented that the subject Skid Steer:

    a. had characteristics, uses, and benefits that it did not have;

    b. was of a particular quality when it was of another that differed materially from the representation, and

    c. was willfully misrepresented, by exaggeration, falsehood, innuendo, or ambiguity as to a material fact.

68. In the alternative, the sale of the subject Skid Steer by Defendant CNH was a deceptive act as defined in the Kansas Consumer Protection Act, K.S.A. § 50-626(b), in that Defendant willfully failed to state a material fact, or willfully concealed, suppressed, or omitted a material fact when it sold the subject Skid Steer, namely that:

    a. the Skid Steer was not reasonably safe in foreseeable tip-overs by reason of its design allowing for the spilling of hot and flammable hydraulic fluid which departed from public safety standards as pled elsewhere herein;

    b. this was particularly deceitful given the public's reasonable and well known expectations that such a vehicle with a Rollover Protective Structure would be reasonably safe for the operator in the event of a foreseeable tip-over, and

      c. the Skid Steer had not been adequately tested or evaluated for its performance in foreseeable tip-overs to determine whether it was reasonably safe for the operator

69. The sale of the subject Skid Steer by Defendant CNH was an unconscionable act or practice as defined in the Kansas Consumer Protection Act, K.S.A. § 50-627, when considering what the supplier knew or should have known, because, among other things and at a minimum, the suppliers made misleading statements of opinion on which consumers such as Lloyd Kottman and Charlie Thrush were likely to rely on to their detriment and that of their friends or family or also used the machine

70. As a direct and proximate result of the Defendant's violations of the Kansas Consumer Protection Act, plaintiffs were damaged, and seek all damages allowed pursuant to K.S.A. 50-634(b), including attorney's fees.

WHEREFORE, Plaintiff prays for Judgment against Defendant on Count III of her Complaint, for a fair and reasonable sum of damages in excess of $75,000, for interest on any judgment, for costs herein and for such other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

**PURSUANT TO LOCAL RULE 40.2, PLAINTIFFS HEREBY REQUEST THAT THE PLACE OF TRIAL OF THIS MATTER BE KANSAS CITY, KANSAS.**

Respectfully submitted,

FIELDS LAW FIRM, LLC

*/s/ Benjamin C. Fields*
Benjamin C. Fields           KS   #22209
1600 Genessee Street, Suite 860
Kansas City, Missouri 64102
(816) 659-9970 – telephone
(816) 659-9969 – facsimile
ben@fieldslawkc.com

And

NEUSTROM AND ASSOCIATES, LLC

*/s/ Patrik W. Neustrom*
Patrik W. Neustrom           KS # 9360
118 South Seventh Street
Salina, Kansas 67401
(785) 825-1505 - Telephone
(785) 827-2425 - Facsimile
patrik@neustrom.com